IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DAVID D. AUSTIN II,
on behalf of himself and all others similarly
situated,

                            Plaintiff,                            ORDER

    v.

                                                              15-cv-525-jdp

JUDY P. SMITH, EDWARD WALL,
REXFORD SMITH, and CATHY A. JESS,

                            Defendants.

---

Plaintiff David D. Austin II, a former prisoner at the Oshkosh Correctional Institution (OCI), alleges that the acrylic sheets covering the windows of the cells in certain blocks of OCI cause the cells to be extremely hot and potentially unsafe. I have allowed the case to proceed as a class action on claims under the Eighth and Fourteenth Amendments. The parties have filed cross-motions for summary judgment. Dkt. 102; Dkt. 114; Dkt. 123. Defendants have also moved to decertify the class. Dkt. 103. Because no reasonable juror could conclude that the temperature of the cells was anything more than uncomfortably hot, and because it is not clearly established that transferring certain inmates to uncomfortably hot cells violates the Equal Protection Clause, I will grant summary judgment in defendants' favor.

UNDISPUTED FACTS

I begin with an observation: Many of Austin's proposed facts and responses to defendants' proposed facts do not comply with the court's procedures on motions for summary judgment. *See* Dkt. 51, at 7–13. For example, Austin's general citation to "Group Exhibit C" is

contrary to the court's requirement that each factual proposition be followed by a citation to the specific evidence supporting it—and such a general citation is particularly unhelpful when no entry on the court's docket bears the label "Group Exhibit C" and the document that I take Austin to refer to comprises 221 pages of affidavits. *See* Dkt. 126. The same is true of Austin's general citation to "Medical Records," which I cannot locate on the docket. Even more troublesome are Austin's responses to defendants' proposed facts, many of which purport to dispute the proposed fact but do not cite to evidence supporting Austin's version of the fact. I will accept a proposed fact as undisputed where neither side disputes it, and where the proponent cites to admissible evidence in support of the fact, and the other side offers no evidence in response.

The following facts are undisputed except where noted.

OCI is a medium-security correctional institution for adult male inmates. It comprises 12 housing units, each of which houses about 150 to 200 inmates. The S-Unit is a restrictive housing unit; the remaining 11 units house general population inmates and feature various programs, groups, and accommodations. The units also vary in their design and construction.

This case concerns two units in particular: R-Unit and W-Unit. R-Unit and W-Unit were designed to be available for use as restrictive housing units if necessary. The cells in both units have steel doors and toilets, allowing the cells to be locked at night. And until recently, the cell windows in both units were covered with acrylic sheets and therefore could not be opened, whereas windows in other units may be opened between May and October. These acrylic coverings are the focus of this suit.

Austin was an inmate at OCI from June 2012 to June 2016. During that time, he was housed in several units. He was housed in the R-Unit for two days in 2012 and again from

November 21, 2014, to June 2, 2016. On August 19, 2015, he filed a complaint concerning the conditions in the R-Unit cells. I allowed him to proceed on an Eighth Amendment conditions-of-confinement claim and a Fourteenth Amendment equal protection claim based on his allegations that the acrylic plastic coverings caused his cell to be extremely hot and therefore unsafe. Dkt. 14. Later, after Austin was released from prison and obtained counsel, I allowed him to proceed on Fourteenth Amendment due process claims, too, and I allowed the case to proceed as a class action. Dkt. 42 and Dkt. 49. The class members are all inmates who were housed in R-Unit between August 19, 2009, and April 30, 2016, or who were housed in W-Unit between August 19, 2009, and February 28, 2016. During this time, defendant Judy Smith was the warden of OCI, and defendant Rexford Smith was the Corrections Unit Supervisor of the R-Unit. Defendant Ed Wall was the secretary of the Wisconsin Department of Corrections until February 27, 2016. Defendant Cathy A. Jess is the current secretary of the Department of Corrections.

This case raises two key questions. First, just how hot did the acrylic coverings make the cells in R-Unit and W-Unit? According to Austin, very hot. In support of his position, he points to numerous class members' declarations.[1] Inmates don't have access to thermometers,

---

[1] Defendants Judy P. Smith, Rexford Smith, and Cathy A. Jess, whom I'll refer to as the state defendants, argue that these declarations are inadmissible because they are unreliable. The declarations are forms, presumably drafted by class counsel, with blanks for the individual class members to fill in. About a quarter of the 100 declarations that state that the cell temperature was hotter than the outside temperature in the summer were completed by class members who indicate that they were not housed in R-Unit or W-Unit in the summer and therefore lack personal knowledge of the summer temperatures. I agree with defendants that those statements made without personal knowledge are inadmissible, but it's a close question whether the remaining declarations are inadmissible or merely easy targets for impeachment. At the summary judgment stage, I will give Austin the benefit of the doubt and assume that those declarations that show that the declarant has personal knowledge of the facts are admissible.

but the class members estimate that during the summer, the cells in R-Unit felt between 5 and 30 degrees hotter than cells in other units or the outside temperature, Dkt. 126, at 9, 110, and the cells in W-Unit felt between 10 and 20 degrees hotter than cells in other units or the outside temperature.[2] *Id.* at 35, 110. Over the years, many inmates submitted grievances complaining about the acrylic window coverings; the grievances were dismissed.

But according to OCI staff members, during the summer, the temperature of the cells in R-Unit and W-Unit felt the same as the outside temperature and the temperature in other units. Both units feature ventilation systems designed to regulate the temperature without air conditioning. Austin does not dispute that OCI staff members working on W-Unit had access to a thermometer to monitor the temperature and that the temperature was between 68 and 72 degrees "except in limited instances of extreme heat and cold."[3] Dkt. 111, ¶ 24. Inmates and staff submitted four complaints to maintenance about excessive heat in R-Unit and W-Unit between 2010 and 2016. Maintenance addressed each one. (Most of the complaints during that time period were about cold temperatures.) The state defendants also adduce the report of Donald Horkey, a mechanical engineer, which states that the heating and ventilation system in R-Unit is designed to keep the inside temperature no more than 4.5 degrees hotter than the outside air temperature during the summer, and that the heating and ventilation system in W-Unit is designed to keep the inside temperature no more than 9.8 degrees hotter

---

[2] All temperatures are in degrees Fahrenheit. Some declarants filled in the blanks with implausible numbers, such as "100 or more" degrees hotter. *E.g., id.* at 54. I will assume that these declarants mean that the inside temperature was around 100 degrees.

[3] It's not clear exactly what defendants mean by "limited instances" or "extreme heat." We all know that summer temperatures often exceed 72 degrees in Wisconsin. The parties agree that historical weather data indicates that the average high temperatures during the summer months at issue in this case were in the 70s and 80s.

than the outside air temperature during the summer. *See* Dkt. 141, at 7, 12. Horkey opines that the acrylic coverings "had no impact on the indoor environmental quality." *Id.* at 2.

I turn now to the second question: what were the effects of the heat? An OCI staff member who has worked in R-Unit and W-Unit since before the acrylic coverings were added to the windows does not remember any medical emergencies related to heat. And Austin's medical records reflect no complaints of heat-related conditions while he was housed in R-Unit. But numerous class members state that they suffered from asthma, nasal congestion, difficulty breathing, difficulty sleeping, and headaches, among other ailments, while they were housed in R-Unit or W-Unit. (They don't explain whether they had the same symptoms when they were housed elsewhere.) They believe that these symptoms were the "result of the restrictive nature of" their cells. *E.g.*, Dkt. 126, at 4. Austin points to the report of Humam Farah, a doctor specializing in pulmonary disease and sleep medicine, which states that people who are "exposed to extremes of heat" are likely to suffer symptoms such as the ones described by the class members. Dkt. 134, at 2–4. Farah noted in his report that heat stroke can lead to serious injury. He also reviewed the class members' medical records and found a "higher than expected prevalence" of asthma, which "could be related to ventilation and allergens," and found that inmates "with preexisting asthma have worsened after" coming to R-Unit or W-Unit. Dkt. 171, at 4. Austin also points to the declaration of John Mundt, a licensed clinical psychologist, who explains that psychotropic medications can interfere with the body's ability to regulate heat. Therefore, it is especially important to ensure that people taking these medications stay well hydrated and "have access to cooler areas." Dkt. 172, ¶ 7.

The parties agree that inmates at OCI are allowed to purchase personal fans for their cells and are instructed on how to use fans effectively to combat high temperatures. They also

5

have access to ice, which is sometimes regulated during periods of high demand. When the heat index is greater than 90 degrees, OCI staff provide extra cold fluids, ice, and wet towels to inmates and take other measures to reduce the risk of heat exhaustion and heat stroke. They are also instructed on the signs of heat exhaustion and heat stroke and appropriate responses.

ANALYSIS

Summary judgment is appropriate if a moving party "shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When, as here, the parties have filed cross-motions for summary judgment, the court looks "to the burden of proof that each party would bear on an issue at trial," and then requires that party to establish a genuine issue of material fact. *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997). If any party "fails to make a showing sufficient to establish the existence of an element essential to that party's case," summary judgment against that party is appropriate. *Mid. Am. Title Co. v. Kirk*, 59 F.3d 719, 721 (7th Cir. 1995) (quoting *Tatlovich v. City of Superior*, 904 F.2d 1135, 1139 (7th Cir. 1990)). The court reviews the cross-motions "construing all facts, and drawing all reasonable inferences from those facts, in favor of . . . the non-moving party." *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008) (quoting *Auto. Mechs. Local 701 Welfare & Pension Funds v. Vanguard Car Rental USA, Inc.*, 502 F.3d 740, 748 (7th Cir. 2007)).

Before I turn to Austin's three claims, I note that Austin attempts to use his summary judgment briefs to complain about all sorts of conditions in R-Unit and W-Unit, such as the fact that the cell doors lock at night, the correctional officers' treatment of inmates there, and the barbed wire surrounding W-Unit. These complaints are beyond the scope of the claims on

which I granted Austin leave to proceed, which were all based on the extreme heat allegedly caused by the acrylic plastic window coverings. If Austin wanted to expand his claims, he should have moved for leave to amend his complaint to include them. He did not do so. I will confine my analysis to the claims in Austin's amended complaint on which I allowed him to proceed.

I turn now to Austin's conditions-of-confinement claim. Prison officials violate an inmate's rights under the Eighth Amendment when they are deliberately indifferent to a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). To survive summary judgment, Austin must point to evidence from which a reasonable juror could infer that the acrylic plastic window coverings caused the conditions in R-Unit and W-Unit to be not merely uncomfortable but inhumane, such as conditions posing a substantial risk to health or safety. *Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017); *see also Freeman v. Berge*, No. 03-cv-21, 2003 WL 23272395, at *12 (W.D. Wis. Dec. 17, 2003) ("The same Eighth Amendment standard applies to cell temperatures as to other conditions of confinement: whether the temperatures subject the inmate to a substantial risk of serious harm."). Short-term exposure to temperatures exceeding 100 degrees does not violate the Eighth Amendment by itself. *Freeman*, 2003 WL 23272395, at *13. On the other hand, "there reaches a point when heat is so excessive that the risk to an inmate's health is obvious." *Id.* at *14 (citing *Brock v. Warren Cty.*, 713 F. Supp. 2d 238 (E.W. Tenn. 1989), in which an inmate died after exposure to temperatures up to 100 degrees in a cell with no ventilation and very high humidity).

Viewing the facts in Austin's favor, the temperature in R-Unit and W-Unit cells sometimes reached 100 degrees and often felt uncomfortably hot in the summer. And Dr. Farah explains that exposure to extreme heat can cause serious health problems. But Dr. Farah

7

doesn't explain what length of exposure is required or what temperature qualifies as extreme. And Austin does not point to any evidence that any inmate housed in R-Unit or W-Unit suffered a serious, heat-related health problem. Dr. Farah explains that some of the symptoms the class members complain of *could* have been caused or exacerbated by extreme temperatures, but there's no evidence that they *were* caused by extreme temperatures—or even that the temperatures reached a level that he would consider extreme. And the undisputed facts show that inmates have access to measures offering relief from the heat: cool water, ice, and fans, in addition to the ventilation system. No reasonable juror could conclude that the temperatures in R-Unit and W-Unit posed a substantial risk to the inmates' health or safety, so I will grant summary judgment in defendants' favor on the conditions-of-confinement claim.

The lack of evidence showing inhumane living conditions dooms Austin's due process claim, too, as I predicted in my screening order. *See* Dkt. 42, at 3 ("Austin's Eighth Amendment and due process claims are closely intertwined . . . ."). The Due Process Clause prohibits states from "depriving any person of life, liberty, or property, without due process of law." Inmates have "a liberty interest in avoiding transfer to more restrictive prison conditions if those conditions result in an 'atypical and significant hardship' when compared to 'the ordinary incidents of prison life.'" *Townsend v. Cooper*, 759 F.3d 678, 685 (7th Cir. 2014) (quoting *Townsend v. Fuchs*, 522 F.3d 765, 768 (7th Cir. 2008)). There's no question that Austin and the other inmates who were transferred to R-Unit or W-Unit received no procedural due process, so to prevail on his claim, Austin must show that the hot temperatures in R-Unit and W-Unit posed an atypical and significant hardship. He has not done so for the same reasons discussed above. Just as uncomfortably hot temperatures are not inhumane, they are not an atypical and significant hardship. Many people, both in and out of prison, must deal with the

8

uncomfortable heat and humidity that accompany summer in Wisconsin. So I will grant summary judgment in defendants' favor on the due process claim, too.

Austin's equal protection claim fares no better. An ordinary equal protection claim alleges that the plaintiff has been denied equal treatment because of his membership in an "identifiable group." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 601 (2008). But Austin brings a class-of-one equal protection claim, which alleges that the plaintiff has been denied equal treatment for no rational reason. *D.S. v. E. Porter Cty. Sch. Corp.*, 799 F.3d 793, 799 (7th Cir. 2015) (citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). The required elements of class-of-one claims are not entirely clear, as explained in *Del Marcelle v. Brown County Corp.*, 680 F.3d 887, 891 (7th Cir. 2012) (affirming dismissal of a class-of-one claim by an evenly divided court). To prevail on his class-of-one claim, Austin must show, at a minimum, that (1) defendants intentionally treated him differently from others similarly situated and (2) that there was no rational basis for the difference in treatment. It is an open question whether Austin must also allege that the differential treatment was not merely arbitrary, but motivated by an improper purpose or "reasons of a personal character." *Id.* at 893, 899 (Posner, J., plurality opinion); *see id.* at 917 (Wood, J., dissenting).

The United States Supreme Court has explained that some discretionary decisions are not susceptible to class-of-one claims "because treating like individuals differently is an accepted consequence of the discretion granted." *Engquist*, 553 U.S. at 603. It's not entirely clear whether class-of-one claims are ever "cognizable in the prison disciplinary context." *Talioferro v. Hepp*, No. 12-cv-921, 2013 WL 936609, at *6 (W.D. Wis. Mar. 11, 2013) (collecting cases). Whether transfer to a unit that feels uncomfortably hot is the sort of

uncomfortable heat and humidity that accompany summer in Wisconsin. So I will grant summary judgment in defendants' favor on the due process claim, too.

Austin's equal protection claim fares no better. An ordinary equal protection claim alleges that the plaintiff has been denied equal treatment because of his membership in an "identifiable group." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 601 (2008). But Austin brings a class-of-one equal protection claim, which alleges that the plaintiff has been denied equal treatment for no rational reason. *D.S. v. E. Porter Cty. Sch. Corp.*, 799 F.3d 793, 799 (7th Cir. 2015) (citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). The required elements of class-of-one claims are not entirely clear, as explained in *Del Marcelle v. Brown County Corp.*, 680 F.3d 887, 891 (7th Cir. 2012) (affirming dismissal of a class-of-one claim by an evenly divided court). To prevail on his class-of-one claim, Austin must show, at a minimum, that (1) defendants intentionally treated him differently from others similarly situated and (2) that there was no rational basis for the difference in treatment. It is an open question whether Austin must also allege that the differential treatment was not merely arbitrary, but motivated by an improper purpose or "reasons of a personal character." *Id.* at 893, 899 (Posner, J., plurality opinion); *see id.* at 917 (Wood, J., dissenting).

The United States Supreme Court has explained that some discretionary decisions are not susceptible to class-of-one claims "because treating like individuals differently is an accepted consequence of the discretion granted." *Engquist*, 553 U.S. at 603. It's not entirely clear whether class-of-one claims are ever "cognizable in the prison disciplinary context." *Talioferro v. Hepp*, No. 12-cv-921, 2013 WL 936609, at *6 (W.D. Wis. Mar. 11, 2013) (collecting cases). Whether transfer to a unit that feels uncomfortably hot is the sort of

discretionary act that cannot form the basis of a class-of-one claim is a tough question, and one that I need not answer in light of defendants' qualified immunity defense.

Once a government official raises a qualified immunity defense, a plaintiff must show that (1) he suffered a violation of a statutory or constitutional right; and (2) the law was "clearly established at the time of the alleged violation." *Figgs v. Dawson*, 829 F.3d 895, 905 (7th Cir. 2016) (quoting *Campbell v. Peters*, 256 F.3d 695, 699 (7th Cir. 2001)). A constitutional standard is "'clearly established' when 'various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand.'" *Id.* (quoting *Campbell*, 256 F.3d at 701). A plaintiff need only show that "a reasonable official would understand that what he is doing violates that right." *Lewis v. McLean*, 864 F.3d 556, 566 (7th Cir. 2017) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

As the discussion above indicates, courts are not in agreement that discriminating against an inmate for no rational reason—but not for the inmate's membership in an identifiable group—violates the inmate's rights under the Equal Protection Clause. Rather, as Judge Wood explained in *Del Marcelle*, "[q]ualified immunity will . . . frequently relieve state actors of the burden of litigation in this area [of class-of-one claims]: if discretion is broad and the rules are vague, it will be difficult to show both a violation of a constitutional right and the clearly established nature of that right." 680 F.3d at 915. So regardless whether defendants violated Austin's equal protection rights, they are entitled to qualified immunity, and I will grant summary judgment in defendants' favor on Austin's equal protection claim. I will deny defendants' motion to decertify the class, including Wall's motion to join the state defendants' briefing, as moot.

CONCLUSION

At the beginning of this case, I expected to get a good explanation of why the windows in R-Unit and W-Unit, but not other units at OCI, were covered with acrylic sheets. I never got that explanation. Wisconsin inmates cannot expect air-conditioned luxury, but neither should they swelter needlessly. I credit prison administration for removing the acrylic sheets, but it should not have taken this lawsuit to prompt that action.

I conclude that conditions in R-Unit and W-Unit were not so dangerous that they violated the Constitution. I direct the clerk of court to enter judgment in defendants' favor and close this case.

ORDER

IT IS ORDERED that:

1. Defendants Judy P. Smith, Rexford Smith, and Cathy A. Jess's motion for summary judgment, Dkt. 102, is GRANTED.

2. Defendant Edward Wall's motion for summary judgment, Dkt. 114, is GRANTED.

3. Plaintiff David Austin II's motion for summary judgment, Dkt. 123, is DENIED.

4. Defendants Judy P. Smith, Rexford Smith, and Cathy A. Jess's motion for decertification of the class, Dkt. 103, is DENIED as moot.

5. Defendant Edward Wall's motion to join the state defendants' brief in reply, Dkt. 193, is DENIED as moot.

6. The clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered July 27, 2018.

> BY THE COURT:
>
> /s/
> _____
> JAMES D. PETERSON
> District Judge